United States District Court
Southern District of Texas
**ENTERED**
August 24, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| O.P., by next friend Elizabeth Perez, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | |
| | § | CIVIL ACTION NO. 7:21-cv-00352 |
| WESLACO INDEPENDENT SCHOOL | § | |
| DISTRICT, | § | |
| | § | |
| Defendant. | § | |

## OPINION AND ORDER

The Court now considers "Plaintiffs' Motion for Summary Judgment Pursuant to the Administrative Record and Plaintiffs' Opening Brief in Support of Said Motion,"[1] Defendant's response,[2] and Plaintiff's reply.[3] The Court also considers "Defendant Weslaco Independent School District's Motion for Judgment on the Administrative Record,"[4] Plaintiff's response,[5] and Defendant's reply.[6] After considering the motions, record, and relevant authorities, the Court holds that, in spite of Defendant's procedural violations, Defendant did not ultimately improperly evaluate Plaintiff O.P.'s eligibility for special education services or fail to provide a free appropriate public education under the applicable law. The Court therefore **GRANTS** Defendant's motion for judgment and **DENIES** Plaintiff's motion for summary judgment.

---

[1] Dkt. No. 33.
[2] Dkt. No. 34.
[3] Dkt. No. 39.
[4] Dkt. No. 28.
[5] Dkt. No. 35.
[6] Dkt. No. 38.

## I.   BACKGROUND AND PROCEDURAL HISTORY

This is an Individuals with Disabilities Education Act (IDEA) case. The case therefore centers on Plaintiff O.P.'s individual public school experience. The Court will survey material facts. In December 2014, when O.P. was in third grade, his mother Elizabeth Perez consented to a full individual and initial evaluation.[7] A full individual and initial evaluation, sometimes called a FIE, is a prerequisite under Texas law to evaluate student eligibility for special education under IDEA.[8] That same month, Elizabeth Perez received the notice of procedural safeguards for parents of students with disabilities.[9] In early 2015, the full individual evaluation concluded and the "Admission, Review and Dismissal (ARD) Individualized Education Program (IEP) Report" issued, ascertaining that O.P. did not meet eligibility criteria for a disability under IDEA and did not need special education services. Elizabeth Perez (and all other participants) signed that they agreed with the outcome.[10] "In Texas, a committee that develops an IEP is known as an [ARD] Committee."[11]

At the end of O.P.'s sixth grade year in 2018, he failed to meet the reading standard on the Texas statewide standardized test (the STAAR).[12] Elizabeth Perez then submitted O.P. for evaluation by a private psychologist, Dr. Olga Rodriguez-Escobar, who completed her evaluation in January 2019.[13] Dr. Rodriguez-Escobar diagnosed O.P. with Autism Spectrum Disorder, inattentive Attention Deficit Hyperactivity Disorder, and anxiety and communication disorders.[14] In a crucial February 8, 2019 letter, Elizabeth Perez wrote to the "Central Middle School

---

[7] Dkt. No. 22-5 at 10–14 (Admin. R. 0486–0490).
[8] *See* 19 TEX. ADMIN. CODE § 89.1011(a) (2022).
[9] *Id.*; *accord* Dkt. No. 22-7 at 193, 101:2–6 (Admin. R. 0966).
[10] Dkt. No. 22-5 at 78–81 (Admin. R. 0554–0557).
[11] *R.H. v. Plano Independent School Dist.*, 607 F.3d 1003, 1008 (5th Cir. 2010).
[12] Dkt. No. 22-2 at 6, ¶ 7 (Admin. R. 0005).
[13] *Id.*
[14] Dkt. No. 22-4 at 13 (Admin. R. 0468).

2 / 28

Evaluator," attached Dr. Rodriguez-Escobar's report and diagnoses, and stated, "I would like to get together with you to discuss how [O.P.] would get the help he needs from the school if educationally there are no struggles, but he is easily distracted that I believe could be the reason why he had failed his Reading STARR last year in 6th grade."[15] On February 11th, Defendant school district responded by transmitting a "Notice and Consent for Initial Section 504 Evaluation" and the Section 504 procedural safeguards.[16] Section 504 of the Rehabilitation Act of 1973 is an antidiscrimination provision that protects disabled individuals.[17] Elizabeth Perez consented to a Section 504 evaluation with the disclaimer that she understood "that this [document] is *not* an offer of a Special Education evaluation."[18] On February 14th, Defendant transmitted its "Notice of Section 504 Evaluation Results" and ascertained that O.P. would be entitled to Section 504 accommodation services.[19] Elizabeth Perez consented to such services,[20] however Section 504 "accommodations are not a substitute for an [IDEA] evaluation once a school district is on notice of acts or behavior likely to indicate a disability."[21]

In early 2020, Defendant's Central Middle School counselor Jennifer Acosta attempted to reach Elizabeth Perez to schedule the annual meeting of O.P.'s Section 504 committee.[22] On February 4th, Elizabeth Perez refused to attend the Section 504 meeting.[23] On February 21st, in another crucial letter, Ms. Acosta wrote to Elizabeth Perez and enclosed the IDEA procedural safeguards disclosure. Ms. Acosta explained in the letter that Dr. Rodriguez-Escobar's January

---

[15] Dkt. No. 22-5 at 87 (Admin. R. 0563).
[16] Dkt. No. 22-3 at 16 (Admin. R. 0345).
[17] *See* 29 U.S.C. § 794(a).
[18] Dkt. No. 22-3 at 16 (Admin. R. 0345).
[19] *Id.* at 19 (Admin. R. 0348).
[20] *Id.* at 22 (Admin. R. 0351).
[21] *Spring Branch Indep. Sch. Dist. v. O.W. ex rel. Hannah W.*, 961 F.3d 781, 794 (5th Cir. 2020) (quotation omitted), *cert. denied*, 141 S. Ct. 1389 (2021); *see Est. of Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d 982, 990 (5th Cir. 2014) (reviewing the distinctions between IDEA and Section 504).
[22] Dkt. No. 22-7 at 203, 111:16–23 (Admin. R. 0976).
[23] *Id.* at 204, 112:2–12 (Admin. R. 0977).

2019 report "served as part of the basis in determining [O.P.'s] eligibility for Section 504 services" at the time of his February 2019 evaluation, but in February 2019 and continuing through the date of the letter, "it was [and is] not our belief that [O.P.] was [or is] in need of services through the Special Education program" for various reasons, but that Elizabeth Perez had the "right to request such an evaluation."[24]

Soon thereafter, Plaintiff requested a due process hearing on March 6th.[25] On March 13th, Defendant requested consent to conduct a full individual evaluation and gather information "to determine if the student has a disability and needs special education services."[26] Unfortunately, the COVID-19 pandemic disrupted the remainder of the 2020 school year. When school resumed in the Fall of 2020, O.P. commenced online classes.[27] On September 14th, Elizabeth Perez consented to Defendant's full individual evaluation of O.P.[28] On November 17th, Defendant concluded that O.P. did not qualify for special education services.[29]

Following the due process hearing before Texas Special Education Hearing Officer Yvonne Patton in April 2021, and the issuance of the hearing officer's decision denying Plaintiff relief in June 2021,[30] Plaintiff commenced this case in September 2021.[31] The parties have filed their dispositive motions, all briefing is complete, and the Court turns to the analysis.

---

[24] Dkt. No. 22-3 at 51 (Admin. R. 0380); *see id.* ("In reviewing the data and speaking with his teachers it is our continued belief that [O.P.] is not in need of an evaluation to determine his potential need for special education services.").
[25] Dkt. No. 33 at 18, ¶ 28.
[26] Dkt. No. 22-3 at 47 (Admin. R. 0376).
[27] Dkt. No. 22-7 at 184 (Admin. R. 957).
[28] Dkt. No. 22-3 at 52 (Admin. R. 0381).
[29] *Id.* at 124 (Admin. R. 0453).
[30] Dkt. No. 22-2 at 25 (Admin. R. 0024).
[31] Dkt. No. 5.

## II. DISCUSSION

### a. Legal Standard

IDEA was designed to "ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies."[32] Accordingly, parents of schoolchildren are empowered to formally complain "with respect to any matter relating to the identification, evaluation, or educational placement of the child."[33] The complainant is then entitled to a hearing before a state agency,[34] and entitled thereafter to bring a civil action in federal district court if aggrieved by the hearing officer's findings or decision.[35] Upon appeal to district court, the Court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."[36]

Whereas the parties may entitle their motions as summary judgment motions, the motion is merely "the procedural vehicle for asking [this Court] to decide the case on the basis of the administrative record."[37] Accordingly, the ordinary burden-shifting summary judgment review does not apply and "the existence of a disputed issue of material fact will not defeat such a motion."[38] "In cases such as this, 'although the district court must accord due weight to the hearing officer's findings, the court must ultimately reach an independent decision based on a preponderance of the evidence.' Thus, the district court's review of the special hearing officer's

---

[32] 20 U.S.C. § 1415(a).
[33] *Id.* § 1415(b)(6)(A).
[34] *Id.* § 1415(f).
[35] *Id.* § 1415(i)(2).
[36] *Id.* § 1415(i)(2)(C).
[37] *El Paso Indep. Sch. Dist. v. Richard R.*, 567 F. Supp. 2d 918, 927 (W.D. Tex. 2008) (alteration in original) (quotation omitted).
[38] *Wood v. Katy Indep. Sch. Dist.*, 163 F. Supp. 3d 396, 403 (S.D. Tex. 2015) (Harmon, J.).

recommendation is 'virtually *de novo*.'"[39] The burden of proof is on the party challenging the plaintiff student's individualized education program.[40] The Court's inquiry is as follows:

> First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.[41]

"The role of the judiciary is not to second-guess the decisions of school officials or to substitute their plans for the education of disabled students with the court's. Instead, the court's role is limited to determining whether those officials have complied with the IDEA," with the presumption in favor of the school district's educational plan.[42] "IDEA does not entitle a disabled child to a program that maximizes the child's potential. Instead, IDEA guarantees a 'basic floor' of opportunity, 'specifically designed to meet the child's unique needs, supported by services that will permit him to benefit from the instruction.'"[43] The individualized education plan[44] must be tailored to produce meaningful and nontrivial progress,[45] but "[a]ny review of an [individualized education program] must appreciate that the question is whether [it] is *reasonable*, not whether the court regards it as ideal."[46] The Court is not a rubber stamp commission, however, and need not defer to any administrative findings or decisions when the Court's "own review of the evidence

---

[39] *Klein Indep. Sch. Dist. v. Hovem*, 690 F.3d 390, 394 (5th Cir. 2012) (internal quotation marks omitted) (quoting *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 252 (5th Cir. 1997)). *But see White ex rel. White v. Ascension Par. Sch. Bd.*, 343 F.3d 373, 377 (5th Cir. 2003) ("Our role under the IDEA is purposefully limited.").

[40] *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 51 (2005); *Seth B. ex rel. Donald B. v. Orleans Par. Sch. Bd.*, 810 F.3d 961, 972 (5th Cir. 2016).

[41] *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206–07 (1982) (footnotes omitted).

[42] *R.H.*, 607 F.3d at 1010–11 (citations omitted).

[43] *Richardson Indep. Sch. Dist. v. Michael Z*, 580 F.3d 286, 292 (5th Cir. 2009) (quoting *Michael F.*, 118 F.3d at 247–48).

[44] *See* 20 U.S.C. § 1414(d).

[45] *Richardson Indep. Sch. Dist.*, 580 F.3d at 292 (quoting *Michael F.*, 118 F.3d at 248); *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1001 (2017).

[46] *Leigh Ann H. ex rel. K.S. v. Riesel Indep. Sch. Dist.*, 18 F.4th 788, 798 (5th Cir. 2021) (emphasis and alterations in original) (quoting *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017)).

indicates that the hearing officer erroneously assessed the facts or erroneously applied the law to the facts."[47]

### b. Analysis

#### 1. *Whether Defendant Failed to Disclose IDEA Procedural Safeguards*

At the outset, Defendant argues that some of Plaintiff's claims are barred by the statute of limitations and that the Court should affirm the hearing officer's conclusion that all claims "arising before March 6, 2019 fall outside of the statute of limitations period."[48]

IDEA's procedural safeguards include the requirement that, with certain exceptions, a parent shall have the opportunity to present a formal IDEA complaint "which sets forth an alleged violation that occurred not more than 2 years before the date the parent or public agency knew or should have known about the alleged action that forms the basis of the complaint," unless the applicable state has a different statute of limitations[49] At all times relevant to this case, Texas had a one-year statute of limitations.[50] The special education hearing officer found that O.P.'s mother filed her due process complaint on March 6, 2020, so "[a]ny violations of the IDEA that arose prior to" March 6, 2019 could not be considered.[51]

But, as noted, there are exceptions to the statute of limitations. The statute of limitations does not apply "to a parent if the parent was prevented from filing a request for a due process hearing due to the public education agency's withholding of information from the parent that was required by 34 CFR, §300.1, et seq. to be provided to the parent."[52]

---

[47] *Teague Indep. Sch. Dist. v. Todd L.*, 999 F.2d 127, 131 (5th Cir. 1993)
[48] Dkt. No. 28 at 22–23, ¶¶ 38–39.
[49] 20 U.S.C. § 1415(b)(6)(B).
[50] 19 Tex. Admin. Code § 89.1151(c) (2022).
[51] Dkt. No. 22-2 at 15 (Admin. R. at 0014).
[52] 19 Tex. Admin. Code § 89.1151(d)(2); *accord* 20 U.S.C. § 1415(f)(3)(D).

Accordingly, whether the statute of limitations bars Plaintiff's claims arising before March 6, 2019 depends on whether Defendant improperly withheld information or disclosures. Plaintiff alleges that Defendant refused to initiate a special education evaluation and simultaneously failed to provide the disclosure required by 20 U.S.C. § 1415(b)(3)(B).[53] That statute requires a certain disclosure to the schoolchild's parents "whenever the local educational agency refuses to initiate or change the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to the child." Plaintiff contends that Defendant violated this procedural requirement by failing to send proper notice in February 2019, when their obligation was triggered by Dr. Rodriguez-Escobar's report, as evidenced by Counselor Jennifer Acosta's February 21, 2020 letter.[54]

The Court agrees. Counselor Acosta's letter reveals that, at the time of Elizabeth Perez's written concerns in February 2019, Plaintiff O.P. "was determined eligible for Section 504 services, [but] it was not [Defendant's] belief that [O.P.] was in need of services through the Special Education program."[55] Counselor Acosta's letter therefore reveals that Defendant, in February 2019, had refused to initiate the evaluation or educational placement of O.P. without furnishing the procedural safeguards required by IDEA. In response, Defendant cites inapposite statutes and regulations,[56] then argues that Elizabeth Perez's February 8, 2019 letter did not itself trigger Defendant's duty to deliver the procedural safeguards.[57] Even if Defendant is correct that the February 8th letter does not *alone* demonstrate that Defendant had failed to initiate or change

---

[53] Dkt. No. 5 at 6, ¶ 4.4; Dkt. No. 33 at 8, ¶ 11.

[54] Dkt. No. 33 at 8, ¶ 11.

[55] Dkt. No. 22-5 at 124 (Admin. R. 0600).

[56] Dkt. No. 34 at 23–24, ¶ 44 (citing 20 U.S.C. § 1415(d)(1)(A) and 34 C.F.R. § 300.503).

[57] Dkt. No. 34 at 24, ¶ 45 (citing *Ashley G. ex rel. M.G. v. Copperas Cove Indep. Sch. Dist.*, No. 6:19-CV-00420-ADA-JCM, 2021 WL 1840910, at *6 (W.D. Tex. May 7, 2021) (holding that "expressions of concern about academic performance and requests for school assistance alone do not trigger the IDEA's child find duty"), *aff'd*, No. 21-50437, 2022 WL 797416 (5th Cir. Mar. 15, 2022) (per curiam)).

the identification, evaluation, or educational placement of O.P., Counselor Acosta's letter demonstrates that Defendant determined that O.P.'s placement in special education was not warranted as of February 2019. Yet Defendant should have known that, at the very least, a FIE was warranted. Defendant lastly argues that the hearing officer's determination that Elizabeth Perez was aware of her IDEA procedural rights from having received such disclosure in December 2014 should be affirmed.[58] The Court does not agree that prior delivery of procedural safeguards at some time in the past immunizes Defendant from any future violation of 20 U.S.C. § 1415(b)(3)(B),[59] particularly when such notice must be delivered to parents of a student with a disability *at least* annually,[60] and Elizabeth Perez testified at the administrative hearing that she did not understand the distinction between Section 504 evaluations and IDEA special education evaluations.[61] Because Elizabeth Perez did not receive an appropriate IDEA disclosure, and was consequently confused about her IDEA rights, the Court holds that she was prevented from requesting a due process hearing earlier due to Defendant's "withholding of information from the parent that was required under [IDEA] to be provided to the parent."[62] Accordingly, the Court rejects the hearing officer's judgment that all claims arising before March 6, 2019, are barred by the statute of limitations.

### 2. *Whether Defendant Made an Improper Predetermination*

Relatedly, Plaintiff argues that Defendant made an "improper predetermination" and deprived O.P.'s parents of a meaningful opportunity to participate in O.P.'s individualized

---

[58] Dkt. No. 34 at 25, ¶ 46.
[59] *See* Dkt. No. 35 at 9, ¶ 12.
[60] 34 C.F.R. § 300.504(a).
[61] Dkt. No. 22-7 at 178–179, 86:23–87:1 (Admin. R. 0951–0952).
[62] 20 U.S.C. § 1415(f)(3)(D)(ii); *accord* 19 Tex. Admin. Code § 89.1151(d)(2).

education plan.[63] Defendant responds that Plaintiff's argument relies on the false presupposition that O.P. was entitled to evaluation for special education as of February 2019.[64]

The determination of whether a schoolchild has a disability and the child's consequent educational needs "shall be made by a team of qualified professionals and the parent of the child."[65] "Any effort to determine eligibility prior to an ARD Committee meeting can constituted [sic] improper predetermination."[66]

> Predetermination occurs when the state makes educational decisions too early in the planning process, in a way that deprives the parents of a meaningful opportunity to fully participate as equal members of the IEP team. To avoid a finding of predetermination, there must be evidence the state has an open mind and might possibly be swayed by the parents' opinions and support for the IEP provisions they believe are necessary for their child. But, the right to provide meaningful input is simply not the right to dictate an outcome and obviously cannot be measured by such.[67]

The Fifth Circuit has emphasized that a school district that significantly impedes the parents' "opportunity to participate in the decision making process" indicates a procedural inadequacy.[68]

In this case, after Elizabeth Perez submitted O.P.'s psychological diagnostic report and sought further discussion in February 2019,[69] Defendant determined that O.P. was not eligible for special education. Specifically, Counselor Acosta's February 2020 letter explained that, as of February 2019:

> [I]t was not [Defendant's] belief that [O.P.] was in need of services through the Special Education program. This determination was made with information provided by you, teachers, school records, grades, classroom and information regarding [O.P.'s] school functioning. A review of school-based information indicates that [O.P.] has done well academically, socially and behaviorally.

---

[63] Dkt. No. 33 at 7, ¶ 10.

[64] Dkt. No. 34 at 22, ¶¶ 40–41.

[65] 20 U.S.C. § 1414(b)(4)(A).

[66] *Ashley G. ex rel. M.G. v. Copperas Cove Indep. Sch. Dist.*, No. 6:19-CV-00420-ADA-JCM, 2021 WL 1840910, at *11 (W.D. Tex. May 7, 2021), *aff'd*, No. 21-50437, 2022 WL 797416 (5th Cir. Mar. 15, 2022) (per curiam).

[67] *E.R. ex rel. E.R. v. Spring Branch Indep. Sch. Dist.*, 909 F.3d 754, 769 (5th Cir. 2018) (per curiam) (cleaned up).

[68] *Gloria V. v. Wimberley Indep. Sch. Dist.*, No. 1:19-CV-951-RP, 2021 WL 770615, at *10 (W.D. Tex. Jan. 5, 2021) (quoting *E.R.*, 909 F.3d at 769.

[69] *See supra* note 15.

> Furthermore, I am aware that while in elementary [O.P.] was tested to determine eligibility for Special Education Services and was found to not be eligible at that time. In reviewing the data and speaking with his teachers it is our continued belief that [O.P.] is not in need of an evaluation to determine his potential need for special education services.[70]

Plaintiff argues that Defendant "does not get to make determinations behind closed doors in 2019, and wait to tell the parent about the decision a year later in 2020."[71] The Court agrees. While Elizabeth Perez had an opportunity to participate in O.P.'s individualized education plan insofar as her initial letter and O.P.'s diagnostic report were considered, she had *no* opportunity to review, challenge, or deliberate O.P.'s teacher reports, grades, classroom behavior, school functioning, and other school records. Indeed, Elizabeth Perez was unaware Defendant was even making such determination or her rights to participate in the evaluation.[72] In short, as to any other information Defendant used to make its eligibility determination in 2019, Elizabeth Perez had no opportunity at that time to lodge her objections, debate the test reliability, or emphasize contrary evidence in other school records. Stated simply, she lacked a meaningful opportunity to *fully* participate as an equal member of the team making the special education eligibility determination in 2019. The special education hearing officer decided that "Petitioner did not meet his burden on the claim that the District failed to include Student's parent as a participant in the special education process" because Elizabeth Perez had received adequate notice of her procedural rights and failed to invoke them, but the Court has already determined this finding was erroneous.[73]

Defendant counters that the need for an ARD committee review involving the parent is only established once a student's full individual evaluation is completed and eligibility for special

---

[70] Dkt. No. 22-3 at 51 (Admin. R. 0380).
[71] Dkt. No. 33 at 8, ¶ 10.
[72] *See* Dkt. No. 22-7 at 178–179, 86:23–87:1 (Admin. R. 0951–0952).
[73] *See supra* note 59 and accompanying text.

education is determined.[74] This assertion may be correct, but it misses the point. Defendant

excluded Elizabeth Perez from the opportunity to participate in an ARD review because Defendant

determined that O.P. did not need an FIE—the first step toward an ARD review.[75] Defendant

appears to be attempting to distinguish how the initial eligibility evaluation works from how the

individualized education plan is developed. While the two procedures are described separately in

20 U.S.C. § 1414, numerous laws[76] and cases[77] emphasize the collaborative nature of § 1414. The

Court declines to hold that the initial eligibility evaluation is so distinct from the procedure for

development of the individualized education plan that it may discount the parent's involvement.

Accordingly, the Court rejects the hearing officer's judgment that Plaintiff failed to show that

Defendant failed to include O.P.'s parent in ascertaining the eligibility for special education

services under 20 U.S.C. § 1414(b)(4)(A).

### 3. Whether Defendant Violated its Child Find Obligations

Plaintiff argues that the hearing officer misapplied IDEA's "child find" requirements and

improperly concluded that Defendant did not violate them.[78]

"Child Find" is part of IDEA's "web of procedural regulations" that imposes an affirmative

mandate on school districts.[79] IDEA provides that the school district must meet the condition that

"[a]ll children with disabilities . . . regardless of the severity of their disabilities, and who are in

---

[74] Dkt. No. 34 at 22, ¶¶ 40–41.

[75] 19 TEX. ADMIN. CODE § 89.1011(d); *accord* 19 TEX. ADMIN. CODE § 89.1040(b).

[76] *E.g.*, 20 U.S.C. § 1400(c)(5)(B) (" . . . the education of children with disabilities can be made more effective by strengthening the role and responsibility of parents and ensuring that families of such children have meaningful opportunities to participate in the education of their children at school and at home."); 34 C.F.R. § 300.306(a)(1), (c)(1)(i).

[77] *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 994 (2017) ("These procedures [in § 1414] emphasize collaboration among parents and educators and require careful consideration of the child's individual circumstances."); *I.R. v. L.A. Unified Sch. Dist.*, 805 F.3d 1164, 1169 (9th Cir. 2015); *Millay v. Surry Sch. Dep't*, No. 1:09-cv-411-JAW, 2010 U.S. Dist. LEXIS 130693, at *96 (D. Me. Dec. 8, 2010).

[78] Dkt. No. 33 at 13–14, ¶ 19.

[79] *D.A. ex rel. Latasha A. v. Hous. Indep. Sch. Dist.*, 629 F.3d 450, 453 (5th Cir. 2010).

need of special education and related services, are identified, located, and evaluated."[80] "The IDEA's Child Find requirement obligates public school districts to identify, locate, and evaluate students with suspected disabilities 'within a reasonable time after the school district is on notice of facts or behavior likely to indicate a disability.'"[81] Therefore, "[a] finding of a child find violation turns on three inquiries: (1) the date the child find requirement triggered due to notice of a likely disability; (2) the date the child find duty was ultimately satisfied; and (3) the reasonableness of the delay between these two dates."[82] The notice or suspicion of disability required to trigger the child-find duty cannot be ascertained by a bright line rule, but "a school district generally has sufficient notice if it is aware of facts suggesting the child has a disability and that the child is struggling academically."[83] For example, one student's "academic decline, hospitalization, and incidents of theft should have led [the school district] to suspect her need for special education services."[84] On the other hand, young children's hyperactivity and high school juniors' few absences and missed assignments probably do not trigger the school district's child find obligations.[85]

Defendant strongly urges the Court to rely on a District of Hawaii case.[86] Even in that case, the district court held that the "threshold for 'suspicion' is relatively low" to trigger the school district's child find duties, and "that the inquiry was not whether or not [the student] actually

---

[80] 20 U.S.C. § 1412(a)(3)(A); *accord* 34 C.F.R. § 300.111(a)(1)(i) ("The State must have in effect policies and procedures to ensure that All [sic] children with disabilities residing in the State, including children with disabilities who are homeless children or are wards of the State, and children with disabilities attending private schools, regardless of the severity of their disability, and who are in need of special education and related services, are identified, located, and evaluated.").

[81] *Krawietz ex rel. Parker v. Galveston Indep. Sch. Dist.*, 900 F.3d 673, 676 (5th Cir. 2018) (quoting *Dall. Indep. Sch. Dist. v. Woody*, 865 F.3d 303, 320 (5th Cir. 2017)).

[82] *Spring Branch Indep. Sch. Dist.*, 961 F.3d at 793.

[83] *D.C. ex rel. J.C. v. Klein Indep. Sch. Dist.*, 860 F. App'x 894, 901 (5th Cir. 2021).

[84] *Krawietz*, 900 F.3d at 677 (internal quotation mark omitted).

[85] *See D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 251 (3d Cir. 2012), cited in *D.C. ex rel J.C.*, 860 F. App'x at 901.

[86] Dkt. No. 34 at 26, ¶ 47; Dkt. No. 38 at 3, ¶ 5.

*qualified* for services, but rather, was whether [the student] should be *referred* for an evaluation."[87] In Elizabeth Perez's February 2019 letter, she enclosed O.P.'s psychological evaluation and diagnostic report, expressed "major concerns" about O.P. including his developmental delays, and sought to "discuss how O.P. would get the help he needs from the school" after he failed his "Reading STARR last year."[88] The enclosed psychological report concluded with five recommendations, among them the recommendation that "[p]arent is encouraged to work closely with school staff to determine eligibility for Special Education services (possible AU, OHI, and SI eligibility). Current testing is not intended as a replacement for a SPED [special education] evaluation."[89] In response to Elizabeth Perez's letter, Defendant referred O.P. for a Section 504 evaluation and concluded in February 2019 that he had a major physical or mental impairment that required disability accommodations.[90] In spite of all this, Defendant argues its child-find obligations still were not triggered in February 2019 because O.P. was succeeding in his academics and his teachers and evaluators reported no concerns with non-academic progress such as interpersonal relationships and adaptive behavior.[91] However, Defendant's own school record reflects that O.P. had not fully met his state mathematics standard each year from 2016 to 2019.[92] In sum, Defendant contends that because it did not believe O.P. needed a FIE, Defendant could disregard the parent's and psychologist's belief that O.P. needed to be evaluated for special education.

---

[87] *Haw. Dep't of Educ. v. Cari Rae S.*, 158 F. Supp. 2d 1190, 1195–96 (D. Haw. 2001).
[88] Dkt. No. 22-5 at 87 (Admin. R. 0563).
[89] *Id.* at 96 (Admin. R. 0572).
[90] Dkt. No. 22-3 at 31 (Admin. R. 0360).
[91] Dkt. No. 34 at 28, ¶¶ 50–51.
[92] *Compare* Dkt. No. 22-6 at 87 (Admin. R. 0712), *with Zamora ex rel. S.Z. v. Hays Consol. Indep. Sch. Dist.*, No. 1:19-CV-1087-SH, 2021 WL 2531011, at *10 (W.D. Tex. June 20, 2021) (holding that the school district did not err when the student was fully scholastically successful in regular education classes).

Defendant also faults Elizabeth Perez for not requesting a special education evaluation earlier,[93] but the Fifth Circuit has already rejected this exact argument.[94] Under the totality of the circumstances, the Court holds that Defendant's child-find obligation was triggered by Elizabeth Perez's letter and enclosure on February 8, 2019.[95] The hearing officer's contrary conclusion that Defendant lacked a "reason to suspect Student *may* need specially designed instruction under the IDEA to address that disability"[96] is belied by the administrative record, including Defendant's own conclusion that O.P. *did* need Section 504 accommodations for his disabilities. At minimum, the low threshold for mere suspicion of educational disability was met.

The second time period in assessing a child-find violation is when Defendant referred O.P. for special education evaluation.[97] After receiving notice of her IDEA rights in February 2020, Elizabeth Perez filed a request for a due process hearing on March 6, 2020, and Defendant sought her consent to conduct a full individual evaluation one week later.[98] Accordingly, the question for the Court is whether the delay between February 8, 2019, when Elizabeth Perez delivered O.P.'s psychological report and placed Defendant on notice of a likely student disability, and March 13, 2020, when Defendant first attempted to refer O.P. for IDEA evaluation, was a reasonable delay. The Court holds that it was not. The applicable test is that:

> the reasonableness of a delay is not defined by its length but by the steps taken by the district during the relevant period. A delay is reasonable when, throughout the period between notice and referral, a district takes proactive steps to comply with its child find duty to identify, locate, and evaluate students with disabilities.

---

[93] Dkt. No. 34 at 29, ¶ 52.

[94] *Krawietz* 900 F.3d at 677 (5th Cir. 2018) ("GISD alleges that Ashley's family failed to 'act with any urgency' until late January 2015, but the IDEA imposes the Child Find obligation upon school districts, not the parents of disabled students.").

[95] *See Dall. Indep. Sch. Dist. v. Woody*, 865 F.3d 303, 320 (5th Cir. 2017) ("[T]he district court correctly concluded that the District had reason to suspect Kelsey had a qualifying disability on September 19 when it received Woody's letter, to which Woody had attached documents detailing Kelsey's disabilities.").

[96] Dkt. No. 22-2 at 19 (Admin. R. 0018) (emphasis added).

[97] *See Spring Branch Indep. Sch. Dist.* 961 F.3d at 794 (5th Cir. 2020).

[98] Dkt. No. 34 at 31, ¶ 57.

> Conversely, a time period is unreasonable when the district fails to take proactive steps throughout the period or ceases to take such steps.[99]

In this instance, Defendant simply concluded for itself that no referral for evaluation was warranted in February 2019, first told Elizabeth Perez of this decision in February 2020, then promptly reversed course and sought to evaluate O.P. in March 2020 upon learning of Elizabeth Perez's protest.[100] Again, Defendant elected this course of action despite O.P.'s multiple diagnoses, and the psychologist's recommendation for parents and school staff to determine eligibility for special education, and despite Defendant's own February 2019 conclusion that O.P. suffered from disabilities that necessitated changes to his schooling accommodations. Defendant argues that the Court should focus on the delay between Defendant seeking consent for an evaluation and Plaintiff's grant of that consent,[101] but that is not the applicable time period. For essentially the same reasons described by the Fifth Circuit in *Spring Branch Independent School District v. O.W. ex rel. Hannah W.*,[102] namely that Section 504 accommodations do not absolve a school district of its obligation to intervene under IDEA, the Court rejects the hearing officer's judgment that Plaintiff failed to show a child-find violation under 20 U.S.C. § 1412(a)(3)(A).[103]

### 4.  Whether Defendant Failed to Conduct a Proper Full Individual Evaluation

Turning to Defendant's 2020 evaluations of O.P. to ascertain whether he needed special education services, Plaintiff argues that the hearing officer failed to properly consider Plaintiff's evidence and challenges to Defendant's evidence.[104] Defendant responds that O.P. does not meet

---

[99] *Spring Branch Indep. Sch. Dist.*, 961 F.3d at 794.
[100] Dkt. No. 22-5 at 124 (Admin. R. 0600).
[101] Dkt. No. 34 at 31, ¶¶ 57–58 (The Court again notes the COVID-19 pandemic was declared in March 2020, around the time Defendant offered a FIE).
[102] 961 F.3d at 794.
[103] Dkt. No. 22-2 at 19 (Admin. R. 0018).
[104] Dkt. No. 33 at 2, §§ VI–VII.

the eligibility criteria and Defendant did not commit any error in declining to refer O.P. to special education and did not deny him a free appropriate public education.[105]

IDEA sets forth evaluative procedures that must be used in determining whether a student qualifies for and should be referred to special education services. At issue here is 20 U.S.C. §§ 1414(b)–(c), which require among other things the use of "technically sound instruments" to "assess the relative contribution of cognitive and behavioral factors" that are "administered by trained and knowledgeable personnel." IDEA provides that, to qualify as a child with a disability, the student must have certain impairments "who, by reason thereof, needs special education and related services."[106] Courts evaluate the record to determine whether school districts have complied with IDEA and all applicable implementing regulations.[107]

On November 17, 2020, Defendant completed a full individual evaluation of Plaintiff O.P. and generated one thirty-three-page report concluding that O.P. "does not meet TEA [Texas Education Agency] eligibility criteria for a coding" of Autism Disorder, Emotional Disturbance, or ADHD.[108] On the same date, Defendant also completed a fifteen-page report concluding that O.P. "does not qualify for special education services."[109] In a short analysis, the hearing officer discounted Dr. Olga Rodriguez-Escobar's psychological report because it "lacked proper foundation about Student's educational performance from contemporaneous educational records," and accepted Defendant's analysis because it used "a wide variety of assessment tools," and ultimately concluded that "[n]either the private evaluation nor the District's 2021 FIE supports

---

[105] Dkt. No. 34 at 34, ¶¶ 64–65.
[106] 20 U.S.C. § 1401(3)(A); *see Alvin Indep. Sch. Dist. v. A.D. ex rel. Patricia F.*, 503 F.3d 378, 383 (5th Cir. 2007).
[107] *See, e.g.*, *M.P. ex rel. Richard P. v. Ne. Indep. Sch. Dist.*, No. SA-07-CA-004-XR, 2007 U.S. Dist. LEXIS 87239, at *8–10 (W.D. Tex. Nov. 27, 2007); *Jenn-Ching Luo v. Baldwin Union Free Sch. Dist.*, No. 12-CV-3073(JS)(AKT), 2016 U.S. Dist. LEXIS 3616, at *13–15 (E.D.N.Y. Jan. 12, 2016).
[108] Dkt. No. 22-3 at 112 (Admin. R. 0441).
[109] *Id.* at 124 (Admin. R. 0453).

Student's eligibility under the IDEA."[110] The Court will assess the validity of the hearing officer's judgment by examining two axes of disability, consistent with Plaintiff's challenge to the evidence.

> *i.   Autism*

To constitute a child with the disability of autism under IDEA, the schoolchild must have "a developmental disability significantly affecting verbal and nonverbal communication and social interaction . . . that adversely affects a child's educational performance. Other characteristics often associated with autism are engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, and unusual responses to sensory experiences."[111] Generally, Plaintiff contends that the evaluation instruments used to conduct the Full Individual Evaluation ("FIE") were either flawed or improperly administered.

Plaintiff first argues that the Brief Observation of Symptoms of Autism test (BOSA) is not technically sound and that it was not administered by a properly trained individual and thus violated IDEA.[112] Plaintiff argues that Abbie M. Muñoz, the Licensed Specialist in School Psychology who administered the BOSA to O.P., had only one hour of training on BOSA and had administered it only once before, and that the BOSA itself was "developed as a substitute, on an extremely short time frame without any supporting scientific literature" during the COVID-19 pandemic in 2020.[113] However, the BOSA is derived from the Autism Diagnostic Observation Schedule (ADOS)[114]—an evidently well-established test for autism.[115] The BOSA was created as a stopgap measure "in response to the COVID-19 pandemic" by a team of researchers at the

---

[110] Dkt. No. 22-2 at 22 (Admin. R. 0021).
[111] 34 C.F.R. § 300.8(c)(1)(i), *cited in* 19 TEX. ADMIN. CODE § 89.1040(c)(1) (2022).
[112] Dkt. No. 33 at 20-21, ¶ 33.
[113] Dkt. No. 22-7 at 436, 495-96, 498.
[114] Dkt. 22-7 (Admin. R. 1204).
[115] "Autism Diagnostic Observation Schedule." *Autism Diagnostic Observation Schedule - an Overview | ScienceDirect Topics*, https://www.sciencedirect.com/topics/medicine-and-dentistry/autism-diagnostic-observation-schedule.

University of California, Los Angeles.[116] The BOSA "provides a context of activities that can be presented by an examiner (e.g., a caregiver, therapist) observation to help fill the gap left by not being able to administer the *ADOS* in circumstances."[117] Plaintiff's witness Dr. Rodriguez-Escobar testified that she was unfamiliar with BOSA,[118] but that she believed it was a technically sound instrument.[119]

Plaintiff's challenge to the BOSA amounts to the criticism that it is a COVID-19 countermeasure that lacks the established scientific validity of the ADOS. While the BOSA is evidently not *as good* as ADOS, that fact does not render the BOSA scientifically invalid. The Court finds that Defendant's deployment of the BOSA as a diagnostic tool was appropriate due to the COVID-19 safety concerns. While the ADOS may be a better diagnostic tool, Plaintiff has not shown that the BOSA is unsound or that the one-hour training was inadequate. The use of this tool does not show that Defendant violated IDEA in evaluating Plaintiff O.P.

Plaintiff next argues that the Clinical Assessment for Pragmatics (CAPs), which Defendant used in O.P.'s full individual evaluation to assess for autism, was misapplied.[120] CAPs is an assessment published in 2019 and sold by WPS Publish "that uses video scenes of real people in social situations to assess an examinee's ability to understand and use pragmatic language, including nonverbal cues, as well as overall dynamics of social context."[121]

Plaintiff correctly notes that a chart of nine subtests and indices is discrepant in five instances with the report results section. For example, in the Instrumental Performance (Using

---

[116] Dkt. No. 22-7 at 431, 314:11–17 (Admin. R. 1204).
[117] Dkt. No. 22-3 at 100 (Admin. R. 0429).
[118] Dkt. No. 22-7 at 143, 51:6–8 (Admin. R. 0916).
[119] *Id.* at 159, 67:14–16 (Admin. R. 0932).
[120] Dkt. No. 22-3 at 97-98; Dkt. No. 22-7 at 490.
[121] Adriana Lavi, PhD, CCC-SLP, *(CAPs) Clinical Assessment of Pragmatics*, WPS, https://www.wpspublish.com/caps-clinical-assessment-of-pragmatics#:~:text=CAPs%20is%20a%20revolutionary%20assessment,overall%20dynamics%20of%20social%20context.

Social Routine Language) subtest, O.P. achieved a scaled score of 5, but the results indicate that O.P. "obtained a scaled score of 37, . . . which is in the Average range."[122] Abbie Muñoz agreed that there was a discrepancy between O.P.'s actual score and reported results, but testified that she does "not base a diagnosis or an identification of a student with autism on one scoring item."[123] In another example, O.P. achieved a "Pragmatic Judgment Index" score of seventy-seven, while his results indicate a score of seventy-eight, but the results nevertheless state that O.P.'s "overall performance in this domain was rated to be Poor."[124] Abbie Muñoz further testified that she did not know how to actually apply the CAPs test to ascertain a deficiency in communication, which is a component of autism.[125] Defendant argues that Abbie Muñoz did not believe the CAP test to be particularly reliable as applied to adolescent boys because they are less likely to be emotive,[126] but this argument only furthers the notion that the CAPs is not a "technically sound instrument" as required under IDEA.[127] Abbie Muñoz also testified that, in her opinion, her observations of and experiences with O.P. were inconsistent with his poor scores on the CAP.[128]

With respect to the application of the CAPs test in this case, the Court finds that it reduces the reliability of Defendant's full individual evaluation of O.P., but is insufficient on its own to find a violation of IDEA. IDEA evaluations require "a variety of assessment tools and strategies" and no one test (unless it was the only test used) can be considered in a vacuum.[129]

Plaintiff next challenges the application of the Behavior Assessment System for Children (BASC) evaluation. The evalution requires the subject's behaviors to be "rated by an individual

---

[122] Dkt. No. 22-3 at 98 (Admin. R. 0427).
[123] Dkt. No. 22-7 at 491, 374:13–25 (Admin. R. 1264).
[124] Dkt. No. 22-3 at 99 (Admin. R. 0428).
[125] Dkt. No. 22-7 at 493–94, 376:8–377:13 (Admin. R. 1266–67).
[126] Dkt. No. 22-7 at 428.
[127] 20 U.S.C. § 1414(b)(2)(C).
[128] Dkt. No. 22-7 at 480, 363:9–25 (Admin. R. 1253).
[129] 20 U.S.C. § 1414(b)(2)(A).

who is familiar with [the subject's] typical level of functioning within the environment specified."[130] Generally, it includes a teacher observation component, parental observation, and self-reported student observation system and structured development history.[131] Here the BASC included O.P.'s self-report, parental evaluation, and teacher components. It is unclear form the record whether Ms. Munoz specifically observed O.P. using the BASC criteria, but she did observe him.

Plaintiff argues that the results of the BASC are unreliable because the two teachers who registered their ratings "had only had O.P. in their classes virtually for two months and had never seen him in the presence of other children."[132] Plaintiff also complains that Abbie Munoz was unable to observe O.P. when his camera was off and his microphone was muted.[133] Abbie Muñoz testified that she would have preferred the BASC applied by "teachers who had seen [O.P.] in person with other peers," but testified that the virtual examinations could not have affected the legitimacy of the results.[134]

While the BASC evaluation may have been less than ideal, the Court does not find this to be an IDEA violation given the COVID-19 pandemic. IDEA requires only classroom-based observations and teacher observations.[135] The Court finds that Plaintiff's criticism of the BASC's limitations as applied to O.P. do not render it technically unsound because Abbie Muñoz did

---

[130] Dkt. No. 22-3 at 90 (Admin. R. 0419).
[131] Cecil R. Reynolds, PhD and Randy W. Kamphaus, PhD, *Behavior Assessment System for Children | Third Edition*, PEARSON, https://www.pearsonassessments.com/store/usassessments/en/Store/Professional-Assessments/Behavior/Comprehensive/Behavior-Assessment-System-for-Children-%7C-Third-Edition-/p/100001402.html?tab=product-details.
[132] Dkt. No. 22-7 at 501, 506.
[133] *Id.*
[134] Dkt. No. 22-7 at 501, 384:11–19 (Admin. R. 1274).
[135] 34 C.F.R. §§ 300.305(a)(1)(ii)–(iii).

observe O.P., did collect teacher and parent observations, as well as O.P.'s self-report to incorporate in her analysis.[136]

Plaintiff next challenges the application of the Woodcock-Johnson test (WJ IV), arguing that Defendant's diagnostician Romeo Sanchez misapplied the scores.[137] The WJ IV test is a test to measure cognitive abilities.[138]

The relevant scores are as follows[139]:

| Visual Processing (Gv) | 91 |
|---|---|
| Visualization | 84 |
| Picture Recognition | 111 |
| Pattern Reasoning | 85 |
| Processing Speed (Gs) | 107 |
| Letter-Pattern Matching | 107 |
| Pair Cancellation | 72 |
| Number Pattern Matching | 105 |

Plaintiff's counsel thoroughly reviewed these scores with Romeo Sanchez during the administrative hearing. In his testimony, Mr. Sanchez revealed that the bolded scores are averages of their subparts. For the Processing Speed score, Mr. Sanchez dropped the "outlier" Pair Cancellation score, then committed a math error in averaging the remaining subpart 105 and 107 scores to 107. For Visual Processing, Mr. Sanchez dropped the 84 Visualization score, then committed another math error in averaging the remaining 85 and 111 scores. To explain the dropped scores, Mr. Sanchez testified that he dropped the 72 Pair Cancellation as an outlier score, but did not drop the high 111 Picture Recognition score because the 85 and 111 scores constitute average scores whereas the 84 Visualization score is a "below average" score. But if O.P. had

---

[136] *See id.* § 300.304(b)(3) ("In conducting the evaluation, the public agency must [u]se technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors.").
[137] Dkt. No. 22-7 at 289-290.
[138] *The Woodcock-Johnson IV (WJ IV)*, RIVERSIDE INSIGHTS, https://www.riversideinsights.com/woodcock_johnson_iv?tab=2.
[139] Dkt. No. 22-3 at 116 (Admin. R. 0445).

scored a below average 84 in Pattern Reasoning, then Mr. Sanchez would have dropped the 111

Picture Recognition score as the outlier.[140]

Generally, an outlier is a data point that is much bigger or smaller than the next nearest

point. Often, it is considered an anomaly and for that reason is sometimes excluded when averaging

scores. Here, Mr. Sanchez appeared to use the term "outlier" to exclude scores that were outside a

reasonable range. Exclusion of such "outliers" would appear to taint the result of the WJ IV test.

However, even exclusion of a true outlier would only change the Visual Processing score. Had the

111 score been excluded, and the 84 and 85 averaged, O.P. would have been slightly below average

at 84.5 on Visual Processing. This is but one component of the WJ IV test. There is no evidence

that this one below average score would have changed the outcome here. While the math errors

are peculiar, they do not appear to affect the substantive conclusion that O.P. scored in the average

range for overall visual processing and processing speed.

Plaintiff lastly contends that Defendant's diagnostician Romeo Sanchez directly violated

IDEA by failing to consider Dr. Rodriguez-Escobar's psychological report.[141] IDEA requires

review of evaluations and information provided by O.P.'s parents.[142] Romeo Sanchez testified that

he did not consider anything from the psychological report at the time of his interview, but had

reviewed the report by the time his written contribution was finalized, but does not know why he

excluded discussion of the psychological report in his own analysis.[143]

Plaintiff's argument is unpersuasive. Romeo Sanchez testified that he did ultimately review

Plaintiff's private psychological report, which is all IDEA requires. Even if he had never done so,

Plaintiff does not show that Dr. Rodriguez-Escobar's report was never reviewed by anyone else

---

[140] Dkt. No. 22-7 at 289–293, 197:13–201:15 (Admin. R. 1062–66).
[141] Dkt. No. 33 at 23, ¶ 38.
[142] 20 U.S.C. § 1414(c)(1)(A)(i).
[143] Dkt. No. 22-7 at 288–89, 196:13–197:12 (Admin. R. 1061–62).

involved in the special education eligibility determination. Indeed, Abbie Muñoz testified that she reviewed Dr. Rodriguez-Escobar's report[144] and it is specifically referenced in the written comprehensive evaluation.[145] The Court turns to Plaintiff's next challenge.

### ii. Speech Impairment

To constitute a child with a disability by reason of speech impairment under IDEA, the student must have "a communication disorder, such as stuttering, impaired articulation, a language impairment, or a voice impairment, that adversely affects a child's educational performance."[146] Plaintiff challenges Defendant's evaluation of whether O.P. qualifies, but only challenges Defendant's application of the Goldman Fristoe Test of Articulation.[147] Plaintiff argues that the test reflects O.P.'s "raw score of 0" and percentile rank of fifty-eight, which is inconsistent with older administrations of the Goldman Fristoe Test of Articulation in the record in which O.P. secured higher raw scores but lower percentile ranks.[148] Defendant clarifies that O.P.'s raw score of zero is actually a perfect score: "out of all the sounds tested, O.P. produced zero errors on any of the sounds."[149] A lower raw score therefore rationally correlates with a higher percentile rank. Moreover, on three speech assessments including the Goldman Fristoe Test, O.P. scored in the average range and he "demonstrated within normal limits fluence and voice for his age/grade level based on informal observation during testing procedures."[150] Accordingly, there is no error in Defendant's speech impairment evaluation.

Plaintiff does not directly challenge any other disability assessment.[151]

---

[144] Dkt. No. 22-7 at 420, 303:16–22 (Admin. R. 1193).
[145] Dkt. No. 22-3 at 82 (Admin. R. 411).
[146] 34 C.F.R. § 300.8(c)(11), *cited in* 19 TEX. ADMIN. CODE § 89.1040(c)(10).
[147] Dkt. No. 33 at 24, ¶ 40; Dkt. No. 39 at 15, ¶ 24.
[148] *Id.*
[149] Dkt. No. 34 at 39, ¶ 73.
[150] Dkt. No. 22-3 at 55–56 (Admin. R. 0384–85).
[151] *See* Dkt. No. 33 at 19–25, ¶¶ 32–42.

### III. CONCLUSION AND HOLDING

Plaintiff has proverbially missed the forest for the trees. Plaintiff spends more than a quarter of her brief essentially arguing that Defendant failed to consider Elizabeth Perez's evidence of O.P.'s functioning—such as his difficulty with math and social interaction when he refused to go into a Pizza Hut to pick up a pizza—and Dr. Olga Rodriguez-Escobar's psychological report as more probative than Defendant's own analyses.[152] However, this Court does not intercede as a new member of O.P.'s individualized education plan team. The Court has "limited expertise" in educational affairs,[153] and plays a "purposefully limited" role that does not extend to second-guessing the educational decision-making of local and state officials.[154] Although Plaintiff emphasizes as an example that O.P. had social interaction issues characteristic of autism,[155] Defendant's Licensed Specialist in School Psychology testified that O.P. answered questions appropriately, held a conversation, had good eye contact and facial expressions, played games, and was cognizant of social cues such as being observed and preserving his friend's privacy.[156] Carlos Zamora, O.P.'s science teacher in 8th grade even testified before he taught O.P., O.P. would frequently converse with him even though he was not a student in his class.[157]

Without a doubt, Defendant performed a less than perfect evaluation, but in light of the disputed evidence and thorough analyses on both sides, the Court cannot hold that Defendant's evaluations were so incompetent that they contravened IDEA. The Court agrees with the hearing officer's determination that, ultimately, Plaintiff does not "meet his burden on the claim that [O.P.]

---

[152] Dkt. No. 33 at 26–38, ¶¶ 43–70.
[153] *Seth B.*, 810 F.3d at 979.
[154] *White ex rel. White v. Ascension Par. Sch. Bd.*, 343 F.3d 373, 377 (5th Cir. 2003).
[155] Dkt. No. 33 at 33, ¶ 57.
[156] Dkt. No. 22-7 at 439–40, 322:6–323:25 (Admin. R. 1212–13).
[157] Dkt. No. 22-7 at 352–54, 237:20–236:7 (Admin. R. 1125–26).

is a child with [IDEA-recognized disabilities] in need of special education and related services and the District's evaluation was inappropriate."[158]

In the interest of justice, the Court offers two asides to fully address Plaintiff's claims, even if they are not fully articulated in Plaintiff's motion. Plaintiff appears to chiefly argue that Defendant "significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child"[159] by excluding or discounting Elizabeth Perez's contentions.[160] The Fifth Circuit has held that "failures to meet the Act's procedural requirements are adequate grounds by themselves for holding that the school failed to provide a free appropriate public education" as required by IDEA.[161] However, the Fifth Circuit went on to hold in that case that procedural violations do not themselves engender substantial damages, so the appellate court remanded the case to investigate what would have happened if the schoolchild at issue had been earlier evaluated and whether remedial educational services were actually necessary.[162] As stated in a subsequent case, a school district cannot "be liable for the alleged untimely evaluation, irrespective of whether [the schoolchild] ultimately was eligible for (needed) special education. Rather, . . . relief [is] preconditioned on an IDEA eligibility determination."[163] "Only certain students with disabilities . . . are eligible for IDEA's benefits."[164] "It is well-settled that, without a claim that the [free appropriate public education] was deficient, procedural defects are not actionable."[165] Plaintiff does not argue that O.P.'s IDEA evaluations

---

[158] Dkt. No. 22-2 at 22 (Admin. R. 0021).
[159] 20 U.S.C. § 1415(f)(3)(E)(ii)(II).
[160] Dkt. No. 33 at 5–6, ¶ 4; *see White ex rel. White v. Ascension Par. Sch. Bd.*, 343 F.3d 373, 380 (5th Cir. 2003) (discussing when excluding or disregarding parents constitutes an IDEA violation).
[161] *Jackson v. Franklin Cnty. Sch. Bd.*, 806 F.2d 623, 629 (5th Cir. 1986) (quotation omitted).
[162] *Id.* at 631.
[163] *D.G. v. Flour Bluff Indep. Sch. Dist.*, 481 F. App'x 887, 892 (5th Cir. 2012) (per curiam).
[164] *Alvin Indep. Sch. Dist. v. A.D. ex rel. Patricia F.*, 503 F.3d 378, 382 (5th Cir. 2007).
[165] *T.S. v. Indep. Sch. Dist. No. 54*, 265 F.3d 1090, 1095 (10th Cir. 2001); *accord Dallas Indep. Sch. Dist. v. Woody*, 865 F.3d 303, 317 (5th Cir. 2017) ("[N]ot all procedural violations are transformed into substantive violations.").

would have turned out any differently if conducted in February 2019 versus when they actually took place in late 2020, in which Elizabeth Perez was specifically invited to participate.[166] In fact, while Elizabeth Perez's February 2019 letter identifies O.P.'s failing performance on the reading portion of his state STAAR exam as a specific area of academic concern,[167] O.P. succeeded on that very portion in May 2019, evidently before receiving any IDEA special education services or evaluations.[168] Accordingly, despite Defendant's procedural violations, the Court holds that Plaintiff has failed to carry her burden of persuasion[169] to demonstrate that Defendant denied O.P. a free appropriate public education. Consequently, Defendant's procedural violations are not actionable.

The Court notes the obvious objection—albeit only obliquely lodged by Plaintiff[170]—that Defendant ascertained O.P. had impairments that rendered him eligible for Section 504 accommodations but potentially inconsistently ascertained that O.P. did not have impairments that rendered him eligible for IDEA special education. The Fifth Circuit has confronted this issue before: "some students may qualify for § 504 protection but not qualify for special services under IDEA."[171] That is the case here. As the Fifth Circuit explained, quoting from an article published by a law professor, the ADA Amendments Act of 2008 dramatically expanded the definitions and coverage of Section 504, but "IDEA's more restrictive coverage provisions remain unchanged, so the Amendments Act creates the likelihood there will be a large class of children eligible under the ADA and section 504 who are not covered by IDEA."[172] O.P.'s February 14, 2019 evaluation

---

[166] Dkt. No. 22-6 at 134 (Admin. R. 0759).
[167] Dkt. No. 22-5 at 87 (Admin. R. 0563)
[168] Dkt. No. 22-6 at 58 (Admin. R. 0683).
[169] *Seth B.*, 810 F.3d at 972.
[170] *See* Dkt. No. 33 at 23, ¶ 37.
[171] *Est. of Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d 982, 991 (5th Cir. 2014).
[172] *Id.* (quoting Mark C. Weber, *Procedures and Remedies Under Section 504 and the ADA for Public School Children with Disabilities*, 32 J. NAT'L ASS'N ADMIN. L. JUDICIARY 611, 619 (2012)).

ascertaining that he is eligible for Section 504 services reflects the substantive differences in definitional coverage, acknowledging that "the definition of disability 'shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act.'"[173] Accordingly, the Court's holding that O.P. is not eligible for IDEA services is nevertheless consistent with Defendant finding O.P. eligible for Section 504 services.

For the foregoing reasons, the Court **DENIES** Plaintiff's motion for summary judgment,[174] and **GRANTS** Defendant's motion for judgment.[175] Plaintiff is not the prevailing party under IDEA and is not entitled to attorney's fees.[176] Oral argument is not necessary and Plaintiff's request for oral argument[177] is **DENIED**. This case will terminate upon entry of final judgment.

IT IS SO ORDERED.

DONE at McAllen, Texas, this 24th day of August 2022.

_____
Micaela Alvarez
United States District Judge

---

[173] Dkt. No. 22-3 at 31 (Admin. R. 0360) (quoting ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008) (codified at 42 U.S.C. § 12102(4)(A))).
[174] Dkt. No. 33.
[175] Dkt. No. 28.
[176] *See Gary G. v. El Paso Indep. Sch. Dist.*, 632 F.3d 201, 207 (5th Cir. 2011) (holding that a plaintiff must attain a remedy that materially alters the legal relationship to be entitled to attorney's fees).
[177] Dkt. No. 33 at 40, ¶ 74.